Good morning, Your Honors. May it please the Court, my name is Terrence Cannella and I represent the Appellant, Island Transporter, LLC. I'm here to address the four issues that we raised in our brief. The first is whether or not the United States District Court erred in awarding the plaintiffs $131,884.03 in lost property. The second being whether the United States District Court erred in awarding the plaintiffs $25,270 for lost profits. Thirdly, whether the United States District Court erred in awarding the plaintiffs $100,000 for emotional distress damages. And finally, whether the United States District Court erred in finding Captain Norse negligent in his operation of the Island Transporter on December 11, 2014. I'd like to take the first issue up first in relying upon Judge Saylor's decision in the DeMillo case. I think it's evidently clear that under the General Maritime Law, the ceiling of recovery for lost property in a maritime case is the property's fair market value less. It's salvage value plus any interest thereupon. Yeah, that's the general rule. There's no question about that. But what do you do when there's no fair market value because the property involved is unique? Doesn't Admiralty, being a doctrine that affords the trier considerable discretion, leave room in that situation for the court to employ other appropriate measures to get at fair market value? If there's no comparable sales to use as a measure of fair market value? That is correct, Your Honor. I would agree with that statement. Well, isn't that in effect? I'm not saying that her language was perfect, but isn't that in effect what Judge Torrison did here? I believe that's what she did here, sir. She said there's no comparable sales. It's a unique piece of property. I think the best measure of the value here is the replacement cost, what it's costing them to refurbish and fit out a comparable, indeed older, vehicle to replace the vehicle that they lost. And assuming her predicate facts are correct, that is, that there was credible testimony in the record as to the absence of comparable sales and the uniqueness of the property. I understand there may be competing testimony, which she did not accept as credible. But assuming there's credible testimony to support her view of the facts, what's wrong with her legal analysis? Well, with respect to her legal analysis, Your Honor, I think she's correct in that if the property is in fact unique, then you can go outside. I think that is a correct statement of law. The problem I have in what we hear before this Court is that we think that the fair preponderance of the evidence or the review of that evidence was that there was evidence of fair market value. But it's not evidence that she accepted as credible. She said that the so-called comparables weren't really comparable vehicles because the Mack crane truck that we're involved with here had been specially equipped and fitted and that the vehicles used in the so-called comparable sales weren't comparable at all. Now, that's a finding that we have to honor unless you can convince us that it was clearly erroneous. Counsel, I don't think it helped your case that your expert came in with a fair market value dollar amount that I gather was $1 less than the sale price being asked for the truck that was being sold in Maine in its damaged condition. And he came in and said that the fair market value was $1,000 less than was being asked for the sale of that damaged truck. She just flat out said that that destroyed his credibility. Are you suggesting that what your expert said, that that was a fair measure of fair market value? Well, just to be clear, I think what the expert came in and said was that the present value of the truck as it was found, I believe, in Gray, Maine was $39,500, which was, I'm sorry, the vehicle was being offered for $39,500 in Gray, Maine, and that his valuation was $38,000. Again, that evidence could go to, and our position is that could go to its salvage value with respect to what it would be worth after the loss. Again, there was evidence that the vehicle was actually, in fact, damaged or its crane was damaged, the vehicle itself was repaired. So I think that with respect to the court's analysis, she voided that in her analysis in terms of saving the valuation. Are you saying that she misread his testimony in the sense that he wasn't testifying, that was the fair market value, he was just testifying to salvage value? No, Your Honor, I'm saying that she didn't really address, she did not address whether or not that could be used as salvage value. But that's a different question. The question is just her reason for concluding that there was no fair market value. Was it the only evidence of fair market value or a significant piece that you guys are putting forward of fair market value was based on the expert, who she deemed not credible given what he represented the fair market value to be. And given that he recommended the fair market value being less than the actual market value of it in its damaged state, she thought he was not a very good witness as to what fair market value would be. So what's wrong with her decision on that score? Nothing with respect to what the... So then what do you have left to say she got it wrong in saying that there was evidence of fair market value such that she clearly erred in concluding there wasn't? No, we're saying that she clearly erred in not evaluating that value with respect to its salvage value and making that consideration a law. You started off by saying that her finding that the fair market value of this truck was 200 odd thousand dollars. Yes, Your Honor. That you were going to tell us why that was clearly erroneous. And what evidence do you have to support that other than your expert whose testimony on that subject, I think you've gathered by now all of us think was quite properly discredited by her. Your Honor, with respect to the fair market value of the property, there was a motion to eliminate practice with respect to whether or not the owner, Mr. Ryan Sawyer, could come in and testify as to what the fair market value was. And Mr. Ryan Sawyer was permitted to come in and testify to that fact. And, in fact, he came in and said, in his opinion on direct examination, that the fair market value of his truck was $80,000 to $90,000. And the court made no evaluation, made no mention of that in her analysis. And we feel that that's clearly erroneous. And is that $80,000 to $90,000, that's in the trial record? Yes, Your Honor. That can be found. I can tell you. Okay. No, we'll find it. At the appendix at 389, we included that as well as on page, that would be the transcript of page 717. And, again, that was a concern of ours in terms of we, the owner of the property came in and gave his evaluation of fair market value, and that was discounted or not even considered in the analysis. And so that was a concern of ours. And, again, that's an affront to the General Marathon law. What's an affront? Well, again, the fact that the ceiling of, again, opposition is that the ceiling of recovery is the fair market value. And, again, the finding that this property is unique, I think, also is somewhat erroneous in that Mr. Sawyer came in and also testified that he had done hours of research, looked at 50 or 60 different vehicles, and over the course of that analysis and trying to find a replacement vehicle, and yet despite all that research, he came in and testified under oath that the vehicle's fair market value was $80,000 to $90,000. All right. So, so far I've gathered from you that your best evidence in support of your position on fair market value is that the district judge should have credited the testimony of the owner, who's one of the plaintiffs in this case. That's correct. And we can ask your brother about that. You also mentioned that you were questioning her finding of uniqueness. Based on what? Is there any contrary evidence that this vehicle was not unique? Based upon, well, it's our position that Mr. Sawyer testified to several items or a number of different vehicles that he looked at. In fact, it was an exhibit. Yeah, all of which he found not satisfactory. Correct, Your Honor, that's what he testified to. So what proposition are you arguing for? I go out looking for a comparable vehicle, look at several vehicles which I reject as not comparable, and that somehow makes my vehicle not unique? I mean, I just don't understand what you're trying to point to as evidence of non-uniqueness. Well, again, Your Honor, I think that the issue of uniqueness was a matter that was discounted not only by Mr. Sawyer, in terms of, again, it's not really the issue of uniqueness isn't really what we're focusing on. We're focusing on what the value of that vehicle is. The counsel said, well, I don't understand why you, now perhaps he did testify that the fair market value of the truck was $80,000 to $90,000, and I guess I say, so what? I mean, the purpose of compensatory damages is to make the injured party whole. The court was entitled to make the judgment that in this case, in order to make the plaintiff whole, fair market value wasn't going to do it. It really had to be a replacement value that was going to serve that overriding purpose of compensatory damages, and that goes to the whole question of uniqueness. I mean, they had this very special truck that they had made in a certain way to do the kind of construction work that they do, and the court, it seemed to me in a very detailed analysis, pointed out that in order to get a truck that would do what it had been doing at the time that was so badly damaged, they had to go to the Midwest and find this truck that cost a certain amount, and then they still had to do more work to make it work. So here, fair market value was not consistent with the purpose of compensatory damages. Replacement value was. And I struggle to find what was clearly erroneous about that determination. Well, again, Your Honor, I think that the other issue that we have raised with respect to that, the fair market value of the vehicle is its insured value, which, again, the evidence at trial was that the vehicle was insured for $70,000, and Mr. Sawyer came in and testified that he actually received $80,000 for that vehicle. And again, for the vehicle that he lost, again, compensatory damages being the purpose of. All of that would work if the fair market value is $80,000 or $90,000. No, it's not going to work because of the situation here. She's right in saying there's no market that we can look to, right? Nor is there any inference we can draw from the fact I can choose to insure a piece of property for a part of its fair market value, hedge my possibility of loss to that extent. There's no legal requirement that I insure it for its full market value or that if I insure it for X dollars it can be inferred that X dollars is all the property is worth. People often own million-dollar houses and have $600,000 in insurance or $700,000 in insurance. You see that all the time. I'm not saying it's prudent, but it happens. I want to get to the lost profits, but before we do, I want to make sure I understand your answer to Judge Lopez's question. What's a little puzzling, she does a very detailed analysis in concluding that actually to get the truck that they need for the function that they've been using it, they'd have to spend $130,000 or whatever it is. You're saying that there's testimony from one of the owners of the truck who says that the fair market value of that truck is $90,000. And I'm just trying to reconcile those two features. I would have thought that if an owner of a truck, and this is someone you're likely to agree to this proposition, but I would have thought that if the owner of a truck says this truck's worth $90,000, what he's saying is I can get the same thing for $90,000 on the market. That's your point basically? So it's given that he said that, whatever she's doing is something that under amnesty law you're not allowed to do once we know that you can buy this thing on the market for $90,000. That's correct, Your Honor. If an individual comes into court and tells you what the fair market value of his vehicle is, and he's insured it for that level, and he received that amount of money from his insurance company, first of all, he's not the real party in interest in our view. Are there any documents in the record that show the relationship between him and his insurance company? Yes, Your Honor, there is. And is there an assignment of the claim from him to his insurance company? No, there is not, Your Honor. And why isn't he entitled to bring suit for any portion of the loss that wasn't covered by the insurance? In terms of, again, under Rule 17, I'm sorry, Your Honor, I don't mean to cut you off. You know, I understand the real party in interest rule, but if Judge Barron crashes into my car and I have a $1,000 deductible, my insurance company pays me for my loss minus $1,000, I can sue him for $1,000 unless I've assigned the claim to the insurance company. Why doesn't that same thing work in Admirals? Well, under Rule 17, Your Honor, once the insurance company pays him under the policy terms and also under the doctrine of subrogation, they become the real party in interest. For their payment. Correct. You're saying, I thought the payment was $80,000. Yes, that's correct. You testified that, you're telling us that the evidence shows that the evidence you'd like us to rely on to say what the fair market value is, is $90,000. But by your own account, the insurance did not cover the full damage. Mr. Shorey came and testified that the fair market value, in his opinion, was $80,000 to $90,000. I see. Okay. Again, I can assure you that... Before you sit down, just do the lost profits. Sure. Under the General Maritime Law, when you have a total loss of property, then the recovery for lost profits goes away as well. Is that true for cargo? Have we got a case that says that's true for cargo? I know it's true for vessels. It's true for property. The cases that you cite, the cases that seem on point, all talk about the vessel itself and the vessel bumps into some other vessel. But I take their argument to be, this is not that case because this is cargo on the vessel. Correct. So do we have anything that tells us what to do there? This factual circumstance, I think, is more akin to Judge Stern's decision in the Revlin case where the crane tipped over and he found that there was no lost profits attended to that loss, Your Honor. Yeah. The commentators tend to say, though, that the lost profits bar in admiralty may not apply in circumstances where the lost profits are clearly ascertainable. But in other words, you can't come in and say speculatively, well, if I was able to keep working, I would have made $500,000 in profits on a bunch of contracts that I might have gotten. But that's not this situation. Here we have clearly ascertainable lost profits because the plaintiff had contracts in hand which it then was unable to complete because of the loss. Theoretically, why shouldn't he be able to replace? And he had a vehicle that there's no evidence that the vehicle could be immediately replaced. Even after his search was finished and he couldn't find a replacement, it still took a fair amount of time to outfit the replacement vehicle. So what's the theoretical objection? Well, the theoretical objection is, Your Honor, is that, again, the rule of law is that if there's lost property, you know, I understand the general rule, but what I'm asking is, why is it unfair to award lost profits in this type of situation where the lost property cannot be immediately replaced and where the claimed lost profits are clearly ascertainable? Well, I think one of the issues we have is, Your Honor, is whether those losses are clearly ascertainable. That was one of the issues that we raised in terms of the testimony was, is that some of the jobs were lost, but some of the jobs were actually completed and paid for. And then there was a degree of difficulty in terms of completing those jobs without the vehicle. The court was careful. The court rejected some of the lost profit claims as being too speculative. I mean, the court was very careful to assess the quality of the evidence on the lost profits. Isn't that so? In terms of, the court did make that statement in the record that Erin had given. Yeah, she rejected some of the claims and looked very carefully at what claims were well supported by the evidence and what were not and tried to distinguish between the two. But I think the claims that she discounted, Your Honor, were those claims that were testified to verbally not supported by, I believe it was Exhibit 20, or the spreadsheet that the plaintiff submitted in support of that claim. So again, I think those are the claims that were discounted in terms of those that did not have any documentation or verifiable support. Anything else? Okay, thanks. Thank you. Good morning. Tony Braden for, may it please the Court, Tony Braden for the Sawyer Brothers, and Ryan Sawyer and Ross Sawyer. I think I'll just start right in on that lost profits issue and say that I think that the defendants are correct that as a general proposition under the general maritime law, when you have a constructive total loss of a vessel that goes back 150 years probably, that the ceiling of recovery is the fair market value of the vessel, even in the event that you have a non-negligent vessel. There's a caveat to that, which I suggest is really comparable to our circumstance, which is when, as you pointed out, Judge Barron, you have cargo, in this case a business, then you have to look elsewhere because it's just not analogous, and that is not the general maritime law that fair market value, excuse me, that lost profits are a total bar under the general maritime law. There are a number of cases in the Fifth Circuit that I think we cited in our brief where it talks about how, for example, there was a barge that broke away and it damaged a pipeline, and the pipeline company was able to stop the flow of the oil. They didn't lose any product, but what they did lose was three or four months of production time, and so then they could then turn around three or four months later, sell that same oil that they had to stop, but they were entitled to the lost profits on the interest on those lost profits. And so that's what they're saying is, that's what I'm suggesting is analogous here, where the Sawyer brothers had these three jobs, they had them in their pocket, and they could not do those jobs because they lost their truck. The winter shut down, they didn't have the truck for another three or four months. Were the Fifth Circuit cases negligence cases? They were negligence cases, yes, correct. I've got them in my brief. The names escape me right now. Has anyone purported to give a rationale of why we treat vessels and cargo different with respect to this? Well, when you read the early cases, they sort of repeat this notion of predictability for vessel owners, and so they carve out an exception to the general rule where you say, you know, fair market value of the vessel and the net freight pending. And so you as a vessel owner who is non-negligent, you're entitled to the value of the net freight pending that you lost. But it's too attenuated to then say, well, I also had a charter six months from now. This vessel's lost. I'm going to have to build a new ship or buy a new ship. And so under the General Maritime Law, there's this notion of predictability and protecting vessel owners from things that are too attenuated. That's kind of the historic rationale behind that. And why wouldn't that same rationale apply to cargo? Well, I think that it's not to say that it couldn't, but there just isn't that law under the General Maritime Law. In fact, you have cases that suggest the opposite, which is, you know, yeah, that's the general rule over here when you're dealing with constructive total loss of vessels. When you're dealing with cargo, there are very clear and very limited circumstances in which it is allowable. And they say, well, fishing vessels that, you know, even they were going to sail next week, that's sort of too attenuated and we can't allow that. But there's no case to the contrary that says it extends to non-vessels. Could you address the testimony that he refers to or the evidence in the record of one of the owners of the truck saying that it's worth $90,000 on the market? Yeah, that's a fair question, fair criticism. Ryan Sawyer was not a sophisticated witness. We did not retain an expert on this issue. I asked him that question, and it was sort of a clumsy question, a clumsy time, and he gave a clumsy answer. I think the Court's point— What was it that's clumsy about it? Well, what's clumsy about it is that there are a couple of other suggestions about value of the truck that he was fighting against. First was the $70,000 agreed value in his policy, which Judge Sellier pointed out is, you know, I can underinsure my property. There's no legal requirement that I have to insure it for its full value. So he gives that answer in response to that. You know, it's—you're right in that the Court didn't address it in her opinion, or I should say Mr. Keneally's correct. It is a little bit troubling to find that we're supposed to affirm district court's judgment about the value of a truck that the owner of the truck said was worth less without the district court explaining anything about why that testimony is being discounted. She went to great pains to describe why the truck was worth what it was worth, and she— You know, she—it would have been at least—I mean, it's a surprising thing not to address, which is that the person who actually owns the truck is on record, uncontradicted, saying it's not worth that. I think had she explained in the way that, you know, that I would have liked her to, certainly that would have been— What could the explanation be on this record? So she could have said in response to a question— I don't believe him? I'm sorry? She said, I don't believe the owner knows what the value of the truck was? No, I believe that in context of his full testimony, which is, I could not find a truck that was worth that. Therefore, my testimony is, you know, here is where the fair market value of the truck, it's a term of art for, you know, for somebody to opine on that. When he says, I could not find a truck that had a 68-foot reach, had a 2,200-pound pick, that had four outriggers, that could pass OSHA inspection, that could pass DOT inspection, and he answered very clearly about what those things were that he was looking for, and he could not find a single truck that met those criteria until he was— What was the basis for his testimony that the fair market value was $80,000 or $90,000? Did he explain? No, he didn't. It was—and I take, you know, I take ownership for that in terms of, you know, it's a kind of a—it's sort of a clumsy question at a time that was, you know, sort of not in context with his later testimony. Ryan Sawyer's testimony was split into two different parts. He testified in one set of circumstances, I think it was respect to the emotional distress he felt, and then secondly, with respect to the value of the vessel. So all of those valuation questions came much later in the trial, in which he went into great detail about why he needed that criteria with his truck. Yeah, but what explanation could the district court have given for the answer that he gave to that question? The full context of his answer is that really the replacement value, as a matter of law, his testimony as to the facts, go toward replacement value being the correct measure of the fair market value of the truck. I'm not sure I understand what you've just said. He says the truck is worth $80,000 or $90,000, whatever figure he gives. He then says, I could not find a truck for less than $206,000 with the criteria that I needed it to be. He didn't explain. I think it's worth $90,000 because, you know, I can find a truck for $90,000. That was a, you know, that was a, it was, I don't think he understood the question, frankly. Yeah. And when you consider, you know, all his other testimony, that's sort of really where it comes down to. I guess it's puzzling because he certainly wasn't asking the district court to find that it was $90,000. Absolutely not. No, I think it was, I don't think he understood the question. Counsel, in the briefs, there is a claim that the district court erred because the court should have somehow subtracted the $39,000 or whatever the exact figure was, salvage value figure from the award. The Sawyer brothers had a choice when they were given, when Middle Oak, which was their property carrier, when they were made an offer to settle their property claim, they were given a choice. We can either pay you $80,000 or you can keep the truck and pay us the salvage value, which we find to be $15,000. This isn't in the pleadings. It's not in, it's not part of the record. What is part of the record is that he was paid $80,000 by his own property carrier. To say that the asking price on a truck in a lot is the correct salvage value. I know that, but there was no deduction for salvage value. To say that the salvage value was zero when the asking price was $39,000. The salvage value and the insurance payment was $80,000. I see. So that's the deduction. So the salvage value has been added into the insurance payment, which was then deducted from the award that George Torreson made. Correct. Excluded that from her. Correct. The Sawyer brothers could have and probably regret not taking their own truck back and trying to fix it. Okay. But they did not keep the truck and Middle Oak established the salvage value at $15,000. What do you mean they regret not taking the truck back and trying to fix it? Are you suggesting that had they done that, they would then have had a truck that would have done everything that they expect a truck to do? There are issues of mitigation in cases like this. That might have cost a lot less. Hardly been going out and paying $200,000 for a truck. Why would they regret? I think the answer is that they got, and I guess you have to be a truck guy to appreciate the difference between a Mack truck and a Sterling truck, and that Ryan Sawyer loved his Mack truck. And when he realized he could not find a Mack truck, I think Judge Torreson described just sort of a qualitative difference between a Mack brand and a Sterling brand, and this sense of, wow, had we had the chance to do this all over again, what we know now, maybe it would have made more sense, not from a dollars and cents perspective, which I think are apples to apples with respect to the cost, but just from a brand perspective. When he realized, after he sacrificed his truck, sold it to Middle Oak on the salvage value, then he realizes there are no Mack trucks out there. All I can get is the Sterling that I then need to spend all this money on in order to put into the shape that the Mack was. How do we know that the insurance payment included the salvage value? Is there any way that tells us that? I don't believe so other than you can deduce it, which is, Ryan Sawyer said, I gave the truck to the insurance carrier in exchange for the $80,000 payment. I don't think there's any document suggesting that the salvage value was somehow part of that, and I don't think there's any question that somehow the Sawyer brothers retained the title to the truck, because it was clearly in the record that it had gone off. But how do we know that Sawyer brothers didn't receive $80,000 plus the title to the truck? I think what you have is just the testimony of Ryan Sawyer. Has he made that clear that it was? I believe so. Off the top of my head, it's hard to remember. It's been a year since the trial, but I believe it may have even been evidence that the $80,000 settlement check was part of the evidence, and he testified to that fact, that he tendered the truck and received payment from Middle Oak for the truck. You're confusing me now. He said he received an $80,000 check? Correct. And he got the salvage value? No. I'm sorry. I didn't mean to say that. Okay. Here's the truck, Middle Oak insurance carrier. They say, thank you. Here is $80,000 for everything. Okay. But he was insured for $80,000. That was the agreed amount on the policy, correct? Which is, as one of you pointed out, that's not suggestive of fair market value. No, that's not what I'm asking. I'm just asking how do we know that the payment on the insurance was only being given? Is there going to be evidence that the carrier was not going to pay the $80,000 unless it got the truck back for the salvage value, even though the insurance contract suggested it would have to pay $80,000 without the truck? I don't believe there was testimony to that fact. I can't remember in terms of how that was dealt with, but I do know that he did. But the insurance contract did not require the insurer to give up the truck in order to get the $80,000. He was insured for $80,000. No, I believe it did. Oh, it did? Yeah, I believe so. But I can't remember specifically. In any event, the insurance contract is not in evidence? The insurance contract is not in evidence. Who's responsible for, I guess since we're on, was this part raised? Was this point raised by your opponent, that the contract won't show that it included the salvage value? I don't believe so, but I'd let Mr. Keneally respond to that. The respondent has raised in this court the argument that the salvage value was not accounted for in the computation of damages, which did take into account the insurance payment. So I think the real question is, was the question of who was going to retain the salvage value, was that raised before the district court? I don't believe so, Your Honor, and this is the first time I'm hearing that issue. I think that there was no question that $80,000 was for the truck in exchange for the truck in full payment of the policy. Okay. All right. Well, if it's raised for the first time on appeal, that puts it in a completely different posture. Okay. I just want to point out that the defendant's valuation expert didn't have any concept of OSHA inspection. He didn't have any concept of Department of Transportation inspection. He admitted that that was not part of his training, so therefore this idea that he could say that the value of the truck at the time of the accident, pre-before the accident, was $39,000 or $38,000. You can ask the question. Before you sit down, I wanted to just ask you about the emotional distress issue in one respect. In the end, as I understand the district court's opinion, she concludes that there was a manifestation of a physical injury as to both plaintiffs. As to one, she's relatively clear in stating, as I read her opinion, that the physical manifestation arose because of the trauma of the accident. As to the other, I think it's with respect to shingles, it just seemed to be not that clearly stated that she was saying the shingles was the consequence of the injury on the truck as opposed to it could have been. I don't have the language in front of me to be able to comment. I will say that she heard ample testimony from, first of all, from his medical expert, that there was absolute causation between that experience and were accompanied by all these other physical manifestations that he described on the trial. And that portion of it was corroborated by Dr. Andrew Wish, that Ryan Sawyer had physical manifestations of the experience on the truck. So that was their medical expert, but he also did not have any sort of experience with respect to causation between, you know, an infectious disease and trauma. He said he was not qualified to. Isn't that finding about the physical manifestation of the emotional distress, isn't that finding in there that just in case is necessary? I mean, doesn't the district court suggest that as long as you're in the zone of danger, physical danger which results in emotional distress, that's enough. It may not be necessary to actually show a physical manifestation of the emotional distress. I think that's correct, and I think the court was correct in sort of saying, you know, we don't have clear law in the First Circuit on this issue. We clearly have the zone of danger issue, but then we also have this physical manifestation which is hanging out there in the wings in other circuits. I clearly find in both circumstances, both, you know, they were on the boat. They both thought they were going to die. There's no question they were within the zone of danger. So do you agree that remains an uncertain proposition? As to whether or not that is an additional caveat to emotional distress within the First Circuit, correct. Thank you. Thank you.